UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MILITARYHOMELINK.COM, LLC          :
                                   :
          Plaintiff,               :
                                   :
v.                                 :     C.A. No.  1:18-cv-00011-WES-PAS
                                   :
HUNT COMPANIES, INC.,              :     PLAINTIFF DEMANDS TRIAL BY JURY
HUNT MILITARY COMMUNITIES          :
MGMT., LLC                         :
                                   :
          Defendants.              :

## THIRD AMENDED COMPLAINT

Plaintiff, MilitaryHomeLink.com, LLC ("MHL"), brings this action against defendants,

Hunt Companies, Inc. ("Hunt Companies") and Hunt Military Communities Mgmt., LLC ("Hunt

Military Communities") (collectively, "Defendants" or "Hunt"), and alleges as follows:

### NATURE OF THE ACTION

1.      For at least seven months, Hunt engaged in a systematic campaign to persuade

MHL to continue developing and supporting so-called online "document centers" for Hunt's

military housing websites by repeatedly promising to memorialize the parties' roughly nine-year

relationship in writing and that the parties would continue working together for many more years

to come.  Though successful in persuading MHL to continue developing and supporting the

document centers, Hunt's campaign was dishonest.  Many, if not most, of the promises and

representations made by Hunt concerning its intent to sign a contract and to continue the parties'

relationship were simply not true.  The truth, as it turned out, is that at the same time Hunt was

promising to sign a written contract with MHL and continue the parties' long-term relationship,

Hunt was developing its own online document centers solution to replace MHL, had no intention

of signing a contract and was planning to terminate its relationship with MHL.  But rather than

1

disclose these facts to MHL, Hunt concealed the truth and continued to perpetrate the myth that all was fine between the parties in order to string MHL along and keep MHL working until after Hunt finished developing its replacement solution.  Ultimately, Hunt did not even inform MHL of its termination of the parties' relationship, much less its plan to do so.  MHL only discovered, through its own after-the-fact investigation, that Hunt had, without notice, removed MHL from all of Hunt's military housing websites, replaced MHL with Hunt's own online document solution—which, essentially, copied the functionality of the document centers developed by MHL—and terminated the parties' relationship.

2.      MHL brings this action seeking relief for the extensive pecuniary harm caused by Hunt's breaches of contract and covenant of good faith and fair dealing, misrepresentations, concealment of material facts of which it had a duty to disclose, wrongful interference with MHL's preexisting and advantageous customer relationships, broken promises and unjust enrichment.

## PARTIES

3.      MHL is a Rhode Island company with its principal place of business in Warwick, Rhode Island.  MHL provides resources, information and housing support to military service members and their families prior to, during and after their transition from one military post or base to another.

4.      Upon information and belief, Hunt Companies is a Delaware corporation with its principal place of business in El Paso, Texas.  Among other things, Hunt Companies is an investor and real estate developer in real estate assets, and is a holding company and a parent company and operator of Hunt Military Communities.

5.      Upon information and belief, Hunt Military Communities is a Texas company with its principal place of business in El Paso, Texas.  Hunt Military Communities operates

residential communities for military service members and their families throughout the United States, and is a subsidiary of Hunt Companies acting as Hunt Companies' self-described "military communities division."

6.     Upon information and belief, at all times material hereto, Hunt Military Communities acted as the agent and/or alter ego of Hunt Companies insofar as Hunt Companies so extensively controlled Hunt Military Communities that a relationship of principal and agent was created and/or completely dominated Hunt Military Communities with disregard for its separate identity such that any separateness in corporate form should be disregarded in order to avoid injustice to MHL.

7.     At all material times hereto, Hunt Military Communities and Hunt Companies acted as a single business enterprise while engaging in the conduct alleged herein.  In this regard, upon information and belief, Hunt Military Communities and Hunt Companies conducted their business practices through a maze of interrelated companies—under the umbrella and in the name of Hunt Companies—that have common ownership, business names, business functions, directors, officers, employees, and office locations, as well as unified advertising and marketing. Given this common enterprise, Hunt Military Communities and Hunt Companies are jointly and severally liable.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) because of diversity of citizenship between the parties and because the amount in controversy exceeds $75,000 exclusive of interest and costs.

9.     This Court has personal jurisdiction over Defendants because they have sufficient minimum contacts with Rhode Island to provide this Court with jurisdiction, including Defendants' continuous, systematic and routine communications, business contacts, and

transactions with MHL in Rhode Island over the course of the parties' roughly nine-year business relationship, and because Defendants' conduct was directed at and has caused harm to MHL in Rhode Island.  Through such conduct, Defendants have purposefully availed themselves of the privileges of conducting business in Rhode Island, and when engaging in such conduct, should reasonably have perceived that they would be subjected to this Court's jurisdiction.

10.     Venue is proper under 28 U.S.C. § 1391(b) and (c), because events giving rise to this action occurred in this forum and MHL suffered harm in this forum.

## FACTS

11.     Hunt is in the business of providing housing to military and civilian families located within the boundaries or in proximity to military installations and/or military bases.

12.     MHL developed and maintains a web portal (the "MHL Site") which includes, but is not limited to, a comprehensive forms and documents solution (the "Document Centers"), along with relevant community information for United States military personnel and/or their respective family members.

13.     Beginning in or around 2008, MHL and HP Communities, LLC and/or Pinnacle-Hunt Communities, LLC, upon information and belief each a predecessor and/or affiliate of Hunt, entered into an oral agreement whereby MHL would provide access to the MHL Site as well as create and maintain Document Centers for each of HP Communities, LLC and/or Pinnacle-Hunt Communities, LLC's military properties. Upon information and belief, during this time Hunt and its affiliates and Pinnacle AMS Development Company and its affiliates ("Pinnacle") jointly owned, developed and operated thousands of military housing units throughout the country, including those serviced by MHL, under and through the entity(ies) HP Communities, LLC and/or Pinnacle-Hunt Communities, LLC.  (Hunt, Pinnacle, HP

4

Communities, LLC and Pinnacle-Hunt Communities, LLC are referred to herein collectively as "Hunt/Pinnacle.")

14.     Under the terms of the parties' agreement, Hunt/Pinnacle and MHL agreed to two stages of work: stage one involved the creation of distinct Document Centers developed by MHL for Hunt/Pinnacle's military housing properties (the "Hunt Document Centers"), making the transmission of housing documents more efficient for military families on Hunt/Pinnacle's individual military housing websites; stage two involved the ongoing execution and maintenance of the Hunt Document Centers and providing 24/7 employee and customer support for applicants for Hunt/Pinnacle's properties.

15.     Thus, pursuant to the parties' form of two-stage Document Centers agreement (the "Document Centers Contract"), MHL would serve both as the developer and, later, as the provider and maintainer of the Hunt Document Centers for Hunt/Pinnacle's military properties and as customer/employee support liaison for Hunt/Pinnacle.  The parties did not set a specific term for the Document Centers Contract.

16.     Under the Document Centers Contract, in exchange for access to the MHL Site and MHL's development of the Hunt Document Centers and provision of maintenance and customer/employee support services, Hunt/Pinnacle agreed to provide to MHL daily move-in reports for Hunt/Pinnacle's properties in order to allow MHL to earn commissions by cross-selling related third-party provider products and services to Hunt/Pinnacle's housing prospects.

17.     Through MHL's Hunt Documents Centers solution, embedded within Hunt/Pinnacle's military housing websites, as incoming military families visiting the website for any given Hunt military community website clicked to apply for housing, the housing prospect was redirected to the MHL Site.  The housing prospect would then create a MHL account, or if a

returning user, complete the Hunt/Pinnacle housing application (either military or civilian) and then upload all of the required application documents.  This information was then electronically delivered to the respective Hunt/Pinnacle housing office for processing.  Additionally, all of the Hunt/Pinnacle-housing-applicant's information was concurrently data dumped into Hunt/Pinnacle's real estate property management software, which meant Hunt/Pinnacle's line personnel were relieved of the task of re-entering the housing prospects' information into Hunt/Pinnacle's property management and accounting system.  This process saved Hunt/Pinnacle both time and money by improving and streamlining their office functionality.

18.     MHL invested significant time and resources in the stage-one development work, based on Hunt/Pinnacle's promise and the parties' discussions, understanding and agreement of a long-term relationship whereby MHL would obtain lucrative commissions during and through its future involvement in the ongoing stage-two maintenance and customer/employee support work. In fact, MHL charged Hunt/Pinnacle no fee at all for the stage-one development work, based on its expectancy of future profits during the ongoing stage-two period.

19.     Upon commencement of the parties' Document Center Contract, MHL began the development and maintenance of the Hunt Document Centers for Hunt/Pinnacle's military properties.  At the same time, MHL provided support to Hunt/Pinnacle's customers and employees.  As agreed, Hunt/Pinnacle provided MHL with daily move-in reports as payment. MHL and Hunt/Pinnacle continued to perform under the Document Centers Contract.

20.     In 2011, upon information and belief, Pinnacle and Hunt entered into an agreement whereby Pinnacle transferred to Hunt all ownership, development and property management responsibilities for the Hunt/Pinnacle jointly owned military housing units.  Upon that transfer, upon information and belief, Hunt solely assumed the Document Centers Contract.

21.     MHL and Hunt continued to perform according to the same terms specified under the original two-stage Document Centers Contact and according to MHL and Hunt/Pinnacle's historical course of dealing: MHL continued developing and maintaining the Hunt Document Centers for Hunt's military housing websites and providing the related customer/employee support and services; Hunt continued providing daily move-in reports to MHL.

22.     As during the preceding years, MHL continued to invest significant time and resources developing the Hunt Document Centers, based on Hunt's promise and the parties' discussions, understanding and agreement of a long-term relationship whereby MHL would continue to obtain lucrative commissions during and through its future involvement in the ongoing maintenance and customer/employee support work.

23.     MHL and Hunt's relationship continued without incident for a number of years according to the terms of the Document Centers Contract.

24.     In an August 25, 2015 email, MHL requested that the parties memorialize their Document Centers Contract in writing and provided a form of written contract to Hunt, stating:

> I know we have been working extremely well without a formal agreement, however, it's time to have "something in place" that memorializes our mutual effort.  Please note that all the items outlined within the agreement have already been fulfilled during our ongoing relationship so don't be alarmed thinking I just tossed a project into your lap.

25.     On August 27, 2015, Steve Norman from Hunt responded and promised to "vet through legal and get back to you with questions."  Despite that representation, neither Mr. Norman nor anyone else from Hunt responded to MHL's request for a written contract. Nevertheless, the parties' relationship continued as before under the Document Centers Contact.

26.     In or around March, October and December 2016, based on Hunt's promises and the parties' discussions, understanding and agreement of a long-term relationship, MHL made major, costly rebuilds to the MHL Site and to the Hunt Document Centers.

27.     For example, in or around February 2016, Hunt acquired Forest City Military Communities ("FCMC"), the privatized military housing business unit of Forest City Enterprises, including the company's entire portfolio of privatized military housing assets, associated equity interests and service contracts.  The purchase added approximately 15,000 privatized military housing units to Hunt's existing portfolio.  In an August 1, 2016 email to MHL, Cindy Gersch from Hunt indicated Hunt's intent to implement MHL's Hunt Document Centers solution for the FCMC properties, stating that: "[Hunt] will absolutely add this to our new sites which will be live within the next few months."

28.     Thereafter, in or around October 2016, following further discussions with Hunt, MHL invested significant money and resources rebuilding its MHL Site and the Hunt Document Centers and implementing its Hunt Document Centers solution for the FCMC properties' websites (again, at no cost to Hunt) based on Hunt's promises and MHL's understanding of an ongoing relationship between the parties.  In or around November 2016, Hunt linked the MHL-created Hunt Document Centers to the newly acquired FCMC properties' websites.

29.     Hunt and MHL mutually understood and agreed that—consistent with the Document Centers Contract—MHL would once again commit significant time and resources in developing its Hunt Document Centers solution for each of the newly acquired FCMC properties' websites at no cost to Hunt in exchange for a long-term commitment in managing and monetizing the websites' housing application traffic.

30.     On numerous occasions from August 2016 to April 2017, MHL continued to request that the parties document their relationship in a written contract.

31.     For example, in August 2016, around the time MHL and Ms. Gersch discussed the FCMC properties implementation, they also discussed memorializing the parties' relationship in writing.  At Ms. Gersch's request, MHL provided a draft contract that memorialized the parties' historical relationship.

32.     In a December 20, 2016 email, Karen Plesh of Hunt wrote to MHL regarding execution of the proposed agreement:

> I am new to [Hunt] and have been working with Cindy on executing this agreement.  I understand you have been servicing our HUNT military communities for some time – thank you!  I would appreciate if you could set up a quick online demo for my learning, and perhaps we can then take a few minutes to review the agreement?  I just want to be sure I fully understand all components.  I am out of the office next week, however have time either January 3rd or January 4th.

33.     Then, during a January 3, 2017 telephone conference, among other things, Ms. Plesh and MHL discussed the length and depth of MHL and Hunt's relationship, the terms of the written contract provided by MHL, and MHL and Hunt working together for many more years. Ms. Plesh stated to MHL that she looked forward to continuing the MHL/Hunt relationship.  As had Mr. Norman and Ms. Gersch before her, Ms. Plesh indicated Hunt's intent to review and enter into a written contract.  Ms. Plesh requested that MHL send her a revised contract, which she would review and get back to MHL as soon as possible with any changes.

34.     In an email later that day, MHL forwarded a revised draft contract based on language discussed during the call, and stated that "We look forward to working with you for many more years."

35.     Then, in a February 17, 2017 email to MHL, Ms. Plesh acknowledged that the

parties still needed to discuss the contract and stated:

> I do realize we still need to discuss this.  This is part of a much larger
> initiative in setting up our standard processes, and I will be better
> informed to speak on this in 30-60 days.

36.     In a February 17, 2017 email to Ms. Plesh, MHL responded by stating:

> We will continue to provide our service in good faith to [Hunt] while
> working towards finalizing an agreement.  I will follow up with you
> in the beginning of April to see where you stand.  We look to many
> more years of working with you and [Hunt].

37.     Again, in an April 3, 2017 email, MHL wrote to Ms. Plesh to inquire as to the

status of Hunt's review of the proposed contract, but MHL received no response.

38.     At no time did Mr. Norman, Ms. Gersch, Ms. Plesh or anyone else at Hunt inform

MHL that Hunt did not intend to enter a written contract, much less terminate the parties'

relationship.

39.     Rather, Hunt strung MHL along for many months by promising to review and

sign a contract and preying upon MHL's mistaken belief of a long-term relationship with Hunt.

40.     Since at least February 2017, however, and presumably much earlier,

unbeknownst to MHL, Hunt was developing its own online document solution, had no intention

of reviewing and signing a contract and planned to terminate its relationship with MHL.

41.     Additionally, around April 2017, Hunt knew that MHL was spending money and

resources on further Hunt-specific rebuilds to its MHL Site and to the Hunt Document Centers.

42.     Yet Hunt failed to inform MHL of its plan to terminate the relationship,

misrepresented its intent to execute a contract, and misled MHL into believing that the parties'

relationship would continue for years to come.

43.     MHL continued to perform under the Document Centers Contract relying, as Hunt knew, on Hunt's representations concerning its intent to review and sign a written contract, Hunt's promises and MHL's understanding of a long-term relationship between the parties and Hunt's good faith and common honesty to disclose any facts material to the parties' relationship.

44.     Upon information and belief, Hunt concealed its plan to terminate the parties' Document Centers Contract, misled MHL into believing the parties' relationship would continue for years to come, and misrepresented its intent to review and sign a written contract in order to induce MHL to keep working before MHL finished implementing its Hunt Document Centers solution for the newly acquired FCMC properties and before Hunt had finished building its replacement online document solution.

45.     Upon information and belief, Hunt engaged in this "string along" fraud scheme of repeated false and misleading promises and material omissions to avoid risking business interruption and loss of revenue from its military housing websites developed and serviced by MHL while integrating the FCMC properties and developing its own replacement online document solution.

46.     On or about September 26, 2017, following a roughly nine-year relationship with Hunt, MHL noticed that its daily new housing application submissions for Hunt properties suddenly went from approximately 30-40 per day to zero.

47.     Upon investigation, MHL discovered that Hunt had, without any notice whatsoever, removed MHL from Hunt's military housing websites and had replaced MHL and the Hunt Document Centers with Hunt's own online document solution—built by a Texas website development company called Stanton Street—mirroring the MHL Site and Hunt

Document Centers' functionality and ostensibly reverse-engineered from the MHL Site and Hunt Document Centers.

48.      In this regard, MHL's investigation revealed that a user with the email address Tony@stantonstreet.com created an MHL account and accessed the account on February 14, 2017 (three days before Ms. Plesh's final February 17, 2017 email to MHL about a written contract) and July 28, 2017.

49.      Additionally, in a September 18, 2017 press release, Hunt announced the recent launch of a new "brand" for all of its Hunt Military Communities properties, which included the redesign of Hunt's military housing websites by Stanton Street.

50.      At no time did Hunt ever inform MHL of its intent to "rebrand" or redesign its military housing websites.

51.      When confronted by MHL, Ms. Plesh and Ms. Gersch of Hunt gave shifting, pretextual reasons for terminating the parties' contract.  First, they claimed that Hunt terminated the contract because "MHL is not supported in [real estate property management software] Yardi 7s."  Then, they claimed that Hunt terminated the contract because Hunt's government clients purportedly required that Hunt not use third-parties such as MHL.  Hunt had never raised either of these issues with MHL before.  Each of these reasons was both factually incorrect and pretextual for Hunt's true reasons, stated above.

52.      Regardless of the reason, Hunt gave no notice at all to MHL of its immediate termination of the parties' contract.

53.      Had Hunt provided reasonable notice of its intent to terminate, MHL would have had an opportunity to make alternate arrangements upon termination and minimize its losses in the absence of the Hunt relationship.

54.     For approximately the past nine years, MHL had been embedded within Hunt's military housing websites.  During the course of the parties' relationship, MHL processed and delivered approximately 100,000 military housing applications from rental prospects and likely over 300,000 ancillary documents required by Hunt's military housing offices.  MHL revolutionized this process while tailoring individual solutions for each of Hunt's military office requirements.

55.     In addition, MHL took thousands of customer service calls (both before and after business hours and on weekends) from Hunt's rental prospects, renters and employees.

56.     In short, MHL operated as an extension of Hunt's marketing, line personnel, IT and military office management teams.

57.     Yet, as described above, with no advance notice at all, Hunt terminated the Document Services Contract and cut over to its own online document solution that it had been surreptitiously developing while at the same time concealing its plan to terminate the parties' contract and misrepresenting its intent to review and sign a contract and continue the relationship.

58.     As a result of Hunt's concealment of, or, in the least, failure to disclose these basic facts, misrepresentations and its improper termination of the Document Centers Contract, MHL has suffered a devastating loss of revenue, as well as the loss of its expectancy in profits to be earned in the future.

59.     MHL's value as a going concern has also decreased as a result.

60.     In addition to its loss of profits and business value, MHL expended money on costly system rebuilds during 2016 and the first half of 2017 based on its reliance on Hunt's

misrepresentations concerning executing a signed contract and on Hunt's promises and MHL's understanding of an ongoing relationship between the parties.

61.     Hunt's acts and omissions described above were undertaken maliciously and in bad faith with the intention of benefitting Hunt at the expense of MHL without informing MHL.

## COUNT I
### (Breach of Contract)

62.     MHL repeats and realleges the foregoing paragraphs as if fully set forth herein.

63.     As set forth above, MHL and Hunt formed an oral or implied two-stage Document Centers Contract in 2008 with respect to the development of the Hunt Document Centers and the provision of ongoing maintenance and customer/employee support services.

64.     At the time MHL and Hunt entered into the Document Centers Contract, MHL intended it to be a long-term contract, and believed it was a long-term contract based on the parties' discussions, understanding and agreement of a long-term relationship.  Hunt induced MHL into believing that Hunt also intended the Document Centers Contract to be long-term.

65.     Through their course of dealing between 2008 and 2017, the parties reaffirmed the Document Centers Contract by, among other things, the website development and maintenance, move-in reports and customer/employee support services, and emails and discussions between Hunt and MHL.

66.     MHL fully performed its obligations under the contract, or those obligations were excused.

67.     Hunt acknowledged the existence of the parties' contract through its conduct and written memoranda.

68.     At no time did Hunt notify MHL that it intended to terminate the Document Centers Contract.

69.     As set forth above, in or around September 2017, with no advance notice at all to MHL, Hunt terminated the Document Services Contract and cut over to its own online document solution.

70.     Until the time that it terminated the Document Centers Contract, Hunt never told MHL that it believed the parties' contract could be terminated without notice.

71.     Under applicable law, contracts for an indefinite term are terminable at will by either party and termination of such a contract by one party requires that reasonable notification be received by the other party.

72.     Hunt breached the Document Centers Contract by terminating the Document Centers Contract without providing any advance notice of termination, much less reasonable advance notice of termination.

73.     As a result of Hunt's breach of contract, MHL has been damaged thereby.

## COUNT II
### (Breach of the Covenant of Good Faith and Fair Dealing)

74.     MHL repeats and realleges the foregoing paragraphs as if fully set forth herein.

75.     MHL and Hunt entered into a valid contract wherein MHL has discharged all of the obligations the contract imposed upon it.

76.     Applicable law implies a covenant of good faith and fair dealing into the contract between the parties.

77.     As set forth above, Hunt breached the covenant of good faith and fair dealing by, among other things, failing to disclose its plan to terminate the parties' Document Centers Contract, misleading MHL into believing the parties' relationship would continue for years to come, misrepresenting its intent to review and sign a written contract, failing to provide reasonable notice of its intent to terminate the Document Centers Contract, and otherwise failing

to act honestly and reasonably with regard to the Document Centers Contract and its relationship with MHL.

78.     As a result of Hunt's breaches, MHL has been damaged thereby.

## COUNT III
### (Misrepresentation)

79.     MHL repeats and realleges the foregoing paragraphs as if fully set forth herein.

80.     As set forth above, during the course of the parties' relationship, Hunt made numerous promises and representations to MHL—both express and implied—concerning the Document Centers Contract and the parties' future relationship, including but not limited to the following: (i)  that it intended to and would continue to perform under the Document Centers Contract; (ii) that it intended to and would review and sign a written contract memorializing the parties' relationship; and (iii) that it intended to and would continue the parties' relationship and work together into the future.

81.     MHL reasonably relied on the promises and representations made by Hunt, including—without limitation—by (i) continuing to develop and maintain the Hunt Document Centers; (ii) continuing to provide customer/employee support services to Hunt; (iii) continuing its relationship with Hunt; (iv) undertaking costly rebuilds to the MHL Site and the Hunt Document Centers; and (v) otherwise continuing to perform in good faith under the Document Centers Contract.

82.     MHL suffered significant harm as a direct and proximate result of its reasonable reliance on the promises and representations made by Hunt, including but not limited to, lost revenue, lost expectancy profits, lost business value and unnecessary money spent on rebuilds to the Hunt Document Centers.

83.     The promises and representations upon which MHL reasonably relied and caused it harm were false, Hunt knew or should have known that such promises and representations were false when made and Hunt made such promises and representations to induce MHL to act and/or refrain from acting.

84.     In the least, the promises and representations upon which MHL reasonably relied and caused it harm were made recklessly, would not have been made if Hunt had exercised due care, and Hunt knew or should have known that such promises and representations would induce MHL to act and/or refrain from acting.

**COUNT IV**
**(Fraudulent Concealment)**

85.     MHL repeats and realleges the foregoing paragraphs as if fully set forth herein.

86.     As set forth above, Hunt intentionally acted to conceal, create a false impression, mislead, or otherwise deceive MHL concerning the Document Centers Contract, its intent to review and sign a written contract and its intent to continue the parties' relationship in order to prevent MHL from acquiring material information and to induce MHL to act and/or refrain from acting.

87.     MHL reasonably relied on the actions and omissions made by Hunt and has suffered harm as a direct and proximate result.

**COUNT V**
**(Fraudulent Non-disclosure)**

88.     MHL repeats and realleges the foregoing paragraphs as if fully set forth herein.

89.     As set forth above, Hunt had knowledge of facts concerning the Document Centers Contract, its intent to review and sign a written contract and its intent to continue the parties' relationship that, given the circumstances, Hunt had a duty to disclose to MHL.

90.     Hunt breached the duty of disclosure that it owed to MHL, MHL reasonably relied on the actions and omissions made by Hunt and has suffered harm as a direct and proximate result.

## COUNT VI
### (Tortious Interference)

91.     MHL repeats and realleges the foregoing paragraphs as if fully set forth herein.

92.     Hunt was aware of MHL's preexisting and prospective advantageous customer relationships.

93.     Hunt, with improper motives and/or using improper means, interfered with MHL's preexisting and prospective advantageous customer relationships.

94.     As a direct and proximate result thereof, MHL has suffered harm, including but not limited to loss of business opportunities, lost profits, attorney's fees and other damages.

## COUNT VII
### (Promissory Estoppel)

95.     MHL repeats and realleges the foregoing paragraphs as if fully set forth herein.

96.     As set forth above, the parties' entered into a form of development/maintenance arrangement, whereby MHL would serve both as the developer and, later, as the provider of ongoing maintenance and support services for the Hunt Document Centers.

97.     Hunt induced MHL to charge significantly less than it otherwise would have for the Hunt Document Centers development work, based on the promise of a long-term maintenance and support relationship upon which MHL could profit.

98.     Additionally, as set forth above, Hunt made repeated promises concerning executing a signed contract and of a long-term relationship between the parties.

99.     Hunt induced MHL to undertake major, costly rebuilds to the MHL Site and to the Hunt Document Centers and to keep working during 2016 and the first half of 2017 based on the promise of a signed contract and a long-term relationship between the parties.

100.     In performing the initial development work and the subsequent rebuilds and other work for a significantly reduced fee, at no cost to Hunt, MHL reasonably relied upon Hunt's promises to MHL's significant detriment.

101.     As a foreseeable consequence of its reasonable reliance on Hunt's promises, MHL has been damaged thereby in an amount to be determined at trial.

## COUNT VIII
### (Quantum Meruit)

102.     MHL repeats and realleges the foregoing paragraphs as if fully set forth herein.

103.     As set forth above, MHL provided valuable services to Hunt in connection with the Hunt Document Centers.

104.     Hunt accepted the services provided to it by MHL and benefited from those services.

105.     Hunt has failed and refused to pay MHL the full value of the services referenced herein.

106.     As a result of the conduct described above, Hunt has been unjustly enriched at the expense of MHL by maintaining valuable funds to which MHL is legally entitled.

107.     It would be inequitable to allow Hunt to retain the value of this benefit without properly compensating MHL for the value of the services performed.

108.     Hunt should be required to disgorge all monies, profits, and gains which it obtained or will unjustly obtain in the future at the expense of MHL, and a constructive trust should be imposed for the benefit of MHL.

## COUNT IX
### (Unjust Enrichment)

109.    MHL repeats and realleges the foregoing paragraphs as if fully set forth herein.

110.    As set forth above, MHL conferred a benefit on Hunt by providing it valuable resources and property in the form of the Hunt Document Centers as well as MHL's maintenance and support work associated with the Hunt Document Centers.

111.    Hunt accepted and retained MHL's valuable resources, property and maintenance and support work, and used these to its own advantage and at MHL's expense.

112.    Hunt has been and continues to be unjustly enriched by profiting from the wrongful conduct described herein.  It would be inequitable for Hunt to retain these benefits under these circumstances.

113.    MHL has incurred, and continues to incur detriment in the form of loss of money and property as a result of Hunt's wrongful use of the Hunt Document Centers as well as MHL's maintenance and support work associated with the Hunt Document Centers.

114.    The above-described resources, property and maintenance and support work are unique and there is no adequate remedy at law.

### RELIEF REQUESTED

WHEREFORE, MHL requests that this Court enter judgment in its favor on each Count and against Defendants and grant the following relief:

A.      Award MHL compensatory, consequential and punitive damages;

B.      Order Defendants to make restitution to MHL in an amount sufficient to compensate MHL for Defendants' unjust enrichment, plus interest;

C.      Award MHL its costs, expenses, attorneys' fees and experts' fees;

D.      Award MHL prejudgment and postjudgment interest according to proof; and

E.      Award MHL such other and further relief as the Court deems just and appropriate.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY FOR ALL ISSUES SO TRIABLE**

Respectfully submitted,

Plaintiff,
MILITARYHOMELINK.COM, LLC

By Its attorneys,

/s/ Eric E. Renner
Eric E. Renner  (#7481)
Renner Law, LLC
50 South Main Street, Suite 202
Providence, RI  02903
Phone: 401-404-5251
Fax: 401-404-5285
erenner@rennerlawllc.com

Date:  May 18, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of May, 2018, a true copy of the foregoing document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and copies will be mailed to those indicated as non-registered participants.

/s/ Eric E. Renner