1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - -X
MilitaryHomeLink.com,          :   18-CV-00011(WES)
LLC,
        Plaintiff,             :
                               :
                               :
                               :
                               :
    -against-                  :   United States Courthouse
                               :   Providence, Rhode Island
                               :
                               :
                               :
Hunt Companies, Inc., et       :   Monday, July 23, 2018
al,                            :   10:00 a.m.
        Defendants.

- - - - - - - - - - - - - - - -X

TRANSCRIPT OF CIVIL CAUSE FOR A MOTION TO DISMISS
BEFORE THE HONORABLE WILLIAM E. SMITH
UNITED STATES CHIEF DISTRICT COURT JUDGE

A P P E A R A N C E S :

For the Plaintiff:    ERIC E. RENNER, ESQ
                      Renner Law, LLC
                      50 South Main Street, Suite 202
                      Providence, RI  02903

For the Defendants:   DANIEL I. PRYWES, ESQ
                      JESSICA A. RODRIGUEZ, ESQ.
                      Morris, Manning & Martin, LLP
                      1401 Eye Street, N.W., Suite 600
                      Washington, D.C.  20005

                      MARY C. DUNN, ESQ.
                      Blish & Cavanagh, LLP
                      30 Exchange Terrace
                      Providence, RI  02903

Court Reporter:   Lisa Schwam, CSR, CRR, RPR, RMR
                  One Exchange Terrace
                  Providence, RI  02903

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-Aided Transcription.

1          (In open court)

2          THE COURT:  Good morning.  This is the matter of

3    MilitaryHomeLink.com, LLC versus Hunt Companies, Inc.,

4    et al.  We're here on defendants' motion to dismiss.

5          Let's have counsel identify themselves for the

6    record, please.

7          MR. RENNER:  Good morning, your Honor.  Eric

8    Renner for the plaintiff.

9          MR. PRYWES:  Daniel Prywes for defendants.

10         MS. RODRIGUEZ:  Jessica Rodriguez for

11   defendants.

12         MS. DUNN:  Mary Dunn, local counsel for

13   defendants.

14         THE COURT:  Okay.  Thank you very much.  All

15   right.  This is defendants' motion so I'll here from

16   the defendant first.

17         MR. PRYWES:  Good morning, your Honor.

18         THE COURT:  Morning.

19         MR. PRYWES:  Your Honor, we're here today on the

20   motion of defendants' Hunt Military Communities and its

21   second level parent Hunt Companies to dismiss the

22   nine-count complaint brought by plaintiff, Military

23   Home Link.  The lawsuit arises out of a breakup of a

24   working relationship that began in 2008, and it's a

25   breakup like many where one party didn't want to let go

1    and that's the plaintiff.

2         We're now on the fourth -- third amended

3    complaint so it's the fourth complaint that's been

4    filed in this case.  And our position is that there's

5    still no viable cause of action that's been presented.

6    There are two primary claims that are presented in this

7    case.  One is a breach-of-contract claim.  And that

8    claim is that Hunt -- I'll use Hunt generically to

9    refer to the two defendants -- Hunt breached an oral

10   contract allegedly entered in 2008 when Hunt stopped

11   doing business with plaintiff in 2017.  And as I'll get

12   into, the complaint is internally inconsistent about

13   exactly what that contract allegedly was.

14        The second principal claim is a fraud claim.

15   And that claim is that Hunt fraudulently represented in

16   late 2016, early 2017, that it would enter into a

17   contract to continue the prior arrangement.  That's

18   complaint paragraph 80.  But as I'll get into a little

19   bit later, it was quite clear to everyone that no

20   written contract had been entered.

21        The two main problems with the complaint that

22   sort of pervade the whole complaint are

23   self-contradiction, on the one hand, and on the other

24   hand, it's trying to take some preliminary negotiations

25   that were all subject to the execution of a written

1    contract and to turn them into some kind of binding

2    promise.

3         THE COURT:  I'm going to interject here.  I've

4    read the materials so I have some sense of what your

5    arguments are.  And I'm not sure your framing of the

6    complaint is accurate or correctly describes what it is

7    that the plaintiff is attempting to do in the

8    complaint.  Because as I read a lot of your materials,

9    you seem to rely upon the proposed contract that

10   plaintiff forwarded to and kept encouraging the

11   defendant to either enter or engage in or negotiate or

12   whatever as sort of the terms, if you will.

13        I don't read the complaint that way.  What I

14   think the plaintiff is saying is that there was this

15   oral contract where plaintiff provided work and

16   services, and it may be a question whether it's a

17   service contract or goods -- we can talk about

18   that -- and then there was an effort to get a written

19   agreement with the defendant which may have had other

20   terms in it.  But I don't see the latter as sort of

21   defining the scope of the former.  I don't see the

22   proposal as defining what the actual relationship was.

23        So what I want to start with, though, is

24   something that I really don't fully understand and I'm

25   going to ask Mr. Renner this too.  You described it as

1    a working relationship.  They say it's a contract.

2    Describe for me exactly what it is that the plaintiff

3    did for the defendant.  I don't fully get it.

4              MR. PRYWES:  Okay.  Hunt runs military housing.

5    When someone in the military gets a permanent change of

6    station, they're assigned to, let's say, Rhode Island,

7    a base in Rhode Island, they need to apply for housing.

8    And in order to make that easy for a resident, the

9    plaintiff set up a website and on that website you

10   could apply for housing.

11             THE COURT:  Housing with Hunt?

12             MR. PRYWES:  With Hunt.

13             THE COURT:  Okay.  And they work exclusively

14   during this period for Hunt.

15             MR. PRYWES:  No.  They were free to work with

16   others.  And historically they worked with other

17   companies.  And my understanding is that their other

18   military housing providers were abandoning them and so

19   Hunt was, you know, one of the last relationships they

20   had.

21             THE COURT:  Okay.

22             MR. PRYWES:  So that's what was going on.

23             THE COURT:  So they provide a platform, a

24   website, and on this website a military person could go

25   on and they could look at different options for

1    housing.  And Hunt would be one of those options, and

2    Hunt would list all of its housing options in that

3    location, right?

4            MR. PRYWES:  Right.  They could fill out the

5    forms to apply, and they could also fill out forms to

6    apply for other things and there were ways of signing

7    up with moving companies.  There was a -- and that's

8    where they got the commission income from moving

9    companies and cable TV providers and others who they

10   essentially advertised on their web platform.  So there

11   was no money ever going from Hunt to the plaintiff.

12           THE COURT:  Right.

13           MR. PRYWES:  They got -- they relied -- their

14   business model was to rely on these commissions.  But

15   that model was breaking down, it wasn't working

16   anymore, and so what you had at the end of 2016 is

17   Hunt -- I'm sorry, plaintiff did not want to continue

18   that relationship anymore.  They wanted to move to

19   something drastically different.

20           And that was the whole subject of all those

21   e-mails and telephone calls at the end of 2016, early

22   2017.  They weren't talking about let's continue things

23   the way we always were.  If you look at that, they were

24   talking about a plaintiff proposal that would have

25   required Hunt to basically be the guarantor of their

1    profitability.  If they weren't making money, they

2    wanted Hunt to guarantee their profitability.

3         THE COURT:  But that's all about the proposal

4    that didn't ever come into play.

5         MR. PRYWES:  Exactly.

6         THE COURT:  So, I mean, I see that as kind of

7    irrelevant to this whole question.

8         MR. PRYWES:  Okay.

9         THE COURT:  The question here is -- the first

10   question is whether this relationship that plaintiff

11   had with Hunt, was it a contract?

12        MR. PRYWES:  Right.

13        THE COURT:  And you say it isn't.  And I'm

14   trying to understand -- I mean, it's obviously not a

15   written contract.  It's a relationship.  There's

16   something going on here.  Hunt isn't paying the

17   plaintiff to do anything, as I understand it, with

18   respect to this platform.  Plaintiff is getting its

19   money, as you said, from other parties who were

20   advertising or getting commissions.

21        So one question would be, what's the

22   consideration?  If there's a relationship, what's the

23   consideration?

24        Now, the plaintiff says in the complaint that

25   they are maintaining document centers in this platform,

1    and that there's this whole business about this sort of

2    document center contract.  There's a lot of paragraphs

3    of the complaint that describe it, and there's material

4    in the complaint that says, you know, documents are

5    created for Hunt, basically, like you can do your

6    housing application, you can apply for, you know, all

7    these support services and so forth.

8          And I get the sense out of the complaint that

9    the plaintiff maintains these documents or at least

10   provides the process by which an applicant uploads or

11   submits applications.  So there's clearly something

12   going on between Hunt and the plaintiff.

13         MR. PRYWES:  Right.

14         THE COURT:  And the complaint suggests that the

15   defendant made suggestions or directives that things

16   should be modified in a certain way or they should be

17   provided in a certain way.  So there's the --

18         MR. PRYWES:  Your Honor, I'd like to make two

19   point on that.

20         THE COURT:  Yes.

21         MR. PRYWES:  First of all, the mere fact that

22   you have a continuing relationship with another party

23   does not create a contract.  I've been going to the

24   same dry cleaner for nine years.  We don't have a

25   contract.  I can take my business elsewhere whenever I

1    want.

2         On a more sophisticated level, my law firm has

3    an accounting firm.  We've been using the accounting

4    firm for years.  We don't have a contract that binds us

5    to continue doing business with them.  There has to be

6    an intent to be bound.

7         Now, the second point I'd like to make is that

8    there has to be some certainty, some definiteness about

9    what the terms of the contract are.  And in this

10   complaint that we're dealing with, it's internally

11   contradictory.  On the one hand, the complaint is

12   chockful of allegations that the parties agreed are a

13   long-term relationship.  In the same complaint, there's

14   an allegation that it was terminable at will subject

15   only to a reasonable notification period.

16        So which is it?  You can't have a contract where

17   something as basic as that is up in the air after four

18   complaints.

19        THE COURT:  Well, the description can be that it

20   was a long-term relationship and the parties aspire, at

21   least the plaintiff thought they were aspiring, to have

22   an even longer term relationship and that it can be a

23   terminable-at-will relationship.  That's not

24   inconsistent.

25        MR. PRYWES:  They might have said that, but

1    that's not what they said.  They said it could have

2    been terminated after nine days.  They said this

3    contract could have been terminated after nine days.

4              THE COURT:  But what's inconsistent about that?

5              MR. PRYWES:  Well, it could have been terminated

6    nine days after it was supposedly created.  So how is

7    that a contractual agreement on a long-term

8    relationship?

9              THE COURT:  Well, I get the sense that they're

10   saying not that it was a relationship that had a

11   long-term term to it, but rather that was a description

12   of what they thought the aspiration of the agreement

13   was.

14             If you go to work for me and I say to you, I

15   hope you'll be here for your entire career, and then

16   after a month I decide you're not a good fit and I fire

17   you, I could have had the aspiration to employ you for

18   30 years and still fired you after a month and there's

19   nothing inconsistent with that.

20             MR. PRYWES:  That's not what the complaint says.

21   They might have pled that.  I mean, they might have

22   pled that, but if you look at the agreement -- the

23   complaint, it says time and again there was an

24   agreement on a long-term relationship, one that will

25   continue for years to come.

1              That's their story.  That's the complaint we're

2      dealing with.  That's the one that's before the Court.

3      And that's the one that doesn't make any sense when you

4      compare it to all these other statements, that it was

5      terminable at will, that it was -- could have been

6      ended after nine days.

7              In your Honor's example about hoping, your

8      Honor, you put your finger on it.  That's not a

9      contract.  That's not a contract.  If you say I hope

10     you'll be here your whole career, that's not a

11     contract.  It doesn't bind you to anything.

12             And there was no -- if we can't even tell what

13     the supposed contract is by looking at this complaint,

14     then it fails for lack of essential terms, not to

15     mention all the other contract terms, all the other

16     things that would go -- one would expect to see in a

17     contract like this.

18             And we know what those things are because the

19     plaintiff submitted contracts and they're chockful of

20     all kinds of terms that are important terms about scope

21     of duties, who does what, all kinds of details.  And

22     there's no allegation that any of those things were

23     agreed upon.

24             So I would submit that this alleged contract was

25     too indefinite to qualify as a valid contract.  Now,

1      let's suppose --

2              THE COURT:  Well, let me just refer you to -- I

3      see an argument for what you're suggesting with the

4      complaint, but I think you can read it a different way.

5              Paragraphs 21 and 22 are exactly what I think

6      you're referring to.  21 talks about the two-stage

7      document centers contract and their historic course of

8      dealing.  That the plaintiff continued to develop and

9      maintain the document centers for Hunt and provide the

10     customer/employee support and services.  And Hunt

11     continued to provide the daily move-in reports to the

12     plaintiff.

13             And then 22 says, "As during the preceding

14     years, MHL continued to invest significant time and

15     resources developing the Hunt document centers, based

16     on Hunt's promise and the parties' discussions,

17     understanding and agreement of a long-term relationship

18     whereby MHL would continue to obtain lucrative

19     commissions during and through its future involvement

20     in the ongoing maintenance and customer/employee

21     support work."

22             So you're saying, well, that is describing the

23     term of what plaintiff says the contract was and that's

24     inconsistent with an at-will termination.  But another

25     way of looking at that paragraph is to say that this is

1    the understanding under which the plaintiff was

2    operating.  That it was investing its resources and it

3    was developing its products with this general

4    understanding, which had been encouraged by the

5    defendant in these various discussions back and forth

6    that there was going to be this continuing long-term

7    relationship but recognizing that it was an oral

8    contract and until it was reduced to writing, it was

9    terminable at will.

10        MR. PRYWES:  That's not their theory, though.

11   That's not their theory of the case.

12        THE COURT:  This paragraph, you could read this

13   paragraph as going more to what the damages are in the

14   context of a relationship.

15        MR. PRYWES:  Look at paragraph 18.  18 refers to

16   the parties' discussions, understanding and agreement

17   of a long-term relationship, okay.  And that's -- then

18   we can find many other paragraphs.

19        Paragraph 44 alleges that Hunt misled plaintiff

20   into believing the parties' relationship would continue

21   for years to come.  Paragraph 64 says -- here it says

22   the plaintiff intended it to be a long-term contract

23   and believed it was a long-term contract based on the

24   parties' discussion, understanding and agreement of a

25   long-term relationship.

1          Your Honor, he's tried four times to plead a

2     viable claim and we get this complaint.  And on the one

3     hand, it says it's terminable at will and, on the other

4     hand, it says it's long term.  And then he says that it

5     could have been terminated after nine days.

6          So we don't know what this supposed contract

7     was.  He hasn't pled that with any clarity.  And in

8     order to be a contract, it's a basic contract law,

9     there has to be some definiteness to what the contract

10    requires.  And courts will not supply terms -- and this

11    is important -- courts will not supply terms unless it

12    is conclusively shown that the parties intended to

13    agree to a contract.  That's from the restatement.

14    That's cited in the plaintiff's own papers.

15          So there's no conclusive showing here, there's

16    nothing to support the claim that this was the way

17    you've construed it.  That's not their theory.  But

18    let's suppose, let's just suppose, that there is a

19    contract, okay.  So then the question is, well, what is

20    the -- what are the termination terms of that contract?

21          Now, the authorities that plaintiff cites on

22    page 16 in his brief, specifically *Williston* say where

23    there is a contract of an indefinite termination,

24    courts can go two ways on that.  First of all, they can

25    say, well, the contract has to stay in place for a

1   reasonable time.  And the other version is that it's

2   terminable at will, okay.

3        And we would agree that if there is a contract,

4   it's terminable at will.  And they didn't plead the

5   reasonable period option because plainly after an

6   arrangement's in place for nine years, that would be a

7   reasonable period.  So they haven't alleged that.

8        So they want to argue that the contract was

9   terminable at will, we agree with that much, but that

10  it was subject to a reasonable notification period.

11  Well, we know that there's no holding of that type in

12  Rhode Island.  They claim it's an issue of first

13  impression.

14       We do know that for personal services contracts,

15  those kinds of contracts can be of indefinite duration,

16  but they're terminable at will with no notice of

17  indication.  If I want to fire Joe, I can fire Joe.  He

18  doesn't get an automatic two weeks or four weeks or

19  whatever reasonable period is.  And we know on the

20  other hand that for goods, there is -- in Rhode Island,

21  there is a termination -- there is a right to a

22  reasonable notification.

23       So which is it in this case?  Well, we know that

24  the whole argument about contracts requiring a

25  reasonable notification period and being terminable at

1  will, we know that hasn't been applied by the Rhode

2  Island courts to distributorship contracts which is

3  sort of similar -- well, a distributorship is a kind of

4  services contract.

5        We know it hasn't been applied to that.  We know

6  that the First Circuit has ruled that all these

7  terminable-at-will concepts don't apply outside of the

8  goods context.  That's one of the First Circuit's

9  rulings in *Ross-Simons*.  So they're asking the Court to

10  make this new rule which goes counter to the general

11  principle that personal services contracts are

12  terminable at will, period.

13        Now, to expand the goods rule into the situation

14  has far-reaching implications.  As I said before,

15  imagine that my law firm wants to terminate its

16  accounting firm.  They have been with us for nine

17  years, okay.  Now, do we have to give them a reasonable

18  notification period and what is that?  What about our

19  banking relationships?  We've been banking the same

20  bank for years.

21        THE COURT:  But those analogies are all much

22  closer to the personal services contract.  What we're

23  dealing with here, and none of the cases really address

24  it, is sort of a recognition in the change in the

25  economy to much more of what happens in the economy

1     goes on over the internet.  And so I think it's a close

2     question, frankly, whether transactions that occur on

3     the internet are more analogous to goods or to personal

4     services.

5          And there's at least some authority in other

6     jurisdictions that suggest that we should apply the UCC

7     model and apply the reasonable notice requirement for

8     goods.  And I think we all would recognize that the

9     Rhode Island Supreme Court hasn't had the opportunity

10    to address that.  But I don't think it is just a slam

11    dunk to say that the Rhode Island Supreme Court would

12    conclude this is like a personal services contract and

13    there's no reasonable notice requirement.

14          MR. PRYWES:  Well, your Honor, if it's a close

15    question, then we ought to prevail.

16          THE COURT:  Why?

17          MR. PRYWES:  Because they're trying to take a

18    rule and apply it retroactively to a contractual

19    arrangement that was entered allegedly nine years ago.

20    I mean, your Honor, recognizing the *Pascal* decision

21    that it's very tough to retroactively take new rules of

22    law and apply them retroactively to termination

23    provisions.

24          THE COURT:  Well, but the application of what

25    the law is that applies to this relationship, let's

1    just assume it's contractual for a moment, isn't frozen

2    in time to nine years ago.  And even if it was, the

3    internet was a thing nine years ago.  I mean, you know,

4    Amazon, eBay, Craigslist, it all was thriving nine

5    years ago, I think, and certainly more so now, but this

6    relationship, if it is an ongoing, at-will

7    relationship, I think the rules that govern it move

8    along with the law.

9         And the law has been moving in that direction.

10   I don't think you get to say, well, nine years ago we

11   thought the law was X, we thought it was personal

12   services, so therefore we don't have to give reasonable

13   notice.  It's what the law said at the time your client

14   took the action, which was to terminate the contract.

15        I mean, doesn't your client have an obligation

16   to act in accordance with what the law is right then?

17   Do we have an obligation to give notice to these folks

18   that we're terminating right now, not did we have an

19   obligation to notify them nine years ago?

20        MR. PRYWES:  Well, the alleged contract was

21   entered nine years ago, okay, so what were the parties'

22   expectations back nine years ago?

23        THE COURT:  But if it's a personal services

24   contract, let's say that -- you know, let's say it's an

25   employment contract and you entered the employment

1    relationship in 1982, but you terminated the person in

2    1992.  Well, the Americans with Disabilities Act was

3    passed in I think '89 or '91, maybe the amendments were

4    '91, maybe my years are not precise, but you don't get

5    to say that, well, when we hired this person back in

6    '82, we thought we could terminate her because of her

7    disability and we changed the law, it doesn't apply to

8    us.  That's not the way it works.

9            MR. PRYWES:  Well, that's a federal statute,

10   okay.  We're dealing here -- and I think what the Rhode

11   Island Supreme Court has said, when you are trying to

12   take a new rule law of law and apply it to a situation,

13   a circumstance that occurred some time ago, you can't

14   apply it retroactively unless a few requirements are

15   met, one of which is that that rule of law had to be

16   clearly foreshadowed.

17           And if, as your Honor said, it's a close

18   question of law, what rule do you apply here?  And that

19   means that if it was not clearly foreshadowed back in

20   2009, that the Court would supply this new term that's

21   not in the contract anywhere and, as a matter of law,

22   the Court would supply that.  And we've laid that out

23   in our brief.

24           So let me also just address the implied-in-fact

25   contract claim.  Basically, that claim suffers the same

1    defects, if you will, as the oral contract claim.  If

2    there was not certainty as to terms and if you're

3    trying to apply a new rule of law retroactively, it

4    rises and falls with the oral contract claim.  I don't

5    see it as being any different.

6         Let me address the statute-of-frauds argument.

7    If you construe the complaint as I think it's written

8    as alleging a contract for a long-term relationship,

9    that's an oral contract that's barred by the statute of

10   frauds.

11        THE COURT:  But if you construe it the other

12   way, that it's terminable at will, it's not.

13        MR. PRYWES:  I absolutely agree with that.  All

14   I'm saying is that we have this complaint that has sort

15   of a ying and a yang to it, and we don't know what's

16   the real complaint.

17        And if the complaint is that -- if the

18   plaintiff's going to be held to the allegations that

19   there was an agreement for a long-term relationship

20   that would last for years, it has to be dismissed.

21        THE COURT:  So get to the misrepresentation,

22   concealment, nondisclosure, those counts, because I

23   need to give Mr. Renner a chance and I'm on a limited

24   amount of time here.

25        MR. PRYWES:  Okay.  Thank you for your time,

1    your Honor.  And I will get through those I think more

2    quickly.

3              THE COURT:  Yes.

4              MR. PRYWES:  The actual claim in the fraud

5    counts is that Hunt represented in late 2016 to early

6    2017 that it would continue the parties' relationship

7    as it had been, the historical relationship.  That's in

8    paragraph 80 of the complaint.

9              Now, that -- and I touched on this before.  If

10   we look at all those e-mail communications and so

11   forth, it's quite apparent that what the parties are

12   addressing there is not continuing the relationship as

13   it had been.  What they're addressing is a very

14   different relationship where Hunt was potentially on

15   the hook for large amounts of money.  It could

16   potentially have to pay millions of dollars if it

17   terminated the requested three-year contract early.

18             That's not what they're talking about.  So the

19   whole allegation that there was some kind of fraudulent

20   promise about continuing the historical relationship

21   doesn't match those e-mails.  And those e-mails are the

22   only -- and one telephone call are the only

23   communications that are alleged with particularity.

24             THE COURT:  Well, the allegation -- but that's

25   not nothing.  I mean, they're pretty specific.  The

1    basic allegation is that, look, Hunt knew it wasn't

2    going to continue this relationship with us for a long

3    time.  And they were building their own platform that

4    basically reverse engineered the platform that the

5    plaintiff had been providing for all this time.

6         And in the course of these e-mails they

7    basically strung the plaintiff along leading them to

8    believe that there was going to be some kind of written

9    contract developed to describe this ongoing

10   relationship when there actually was never an intent by

11   Hunt to do that.  And the e-mails of the employee who

12   basically says, you know, with one e-mail, well, I

13   knew, I just took this over, I need a couple of months

14   to kind of, you know, get my head around this thing so

15   get back to me in April.  And then they get back to her

16   in April and she says, well, you know, it's with the

17   legal department and so I need a little more time.

18        I mean, they are saying basically they knew all

19   along that they were going to drop the plaintiff and

20   they should have told them.

21        MR. PRYWES:  Well, there's two principal

22   problems with that, okay.  The first problem in terms

23   of this intent scienter, so forth, if you look at the

24   allegations of the complaint, paragraph 40, paragraph

25   40 alleges that as of February 2017, there was an

1    intent not to proceed.  And it says presumably much

2    earlier, but there's nothing pled with particularity to

3    show that as of December 2016, January 2017, there was

4    some intent to leave the plaintiff.  That's not there.

5          And we know from the *North American Catholic*

6    case and from other cases that you have to plead

7    circumstances to show -- to support an inference of

8    scienter.  And there's nothing in that complaint pled

9    to support an inference of scienter as of January.

10          And then you get to February.  Hunt sends them

11   an e-mail saying, hey, wait a second.  We've got

12   something else cooking.  We've got a larger initiative

13   under way.  I mean, that should have been a red flag to

14   anybody that the brakes have been put on on any further

15   discussion of a contract.

16          Now, the second point I want to make is --

17          THE COURT:  I'm not sure I'm understanding your

18   scienter argument here.  There's a description going

19   from paragraph 30 forward of these -- you know, this

20   back and forth.  So what is it you're -- I'm not sure I

21   understand what you're saying.

22          MR. PRYWES:  Well, what I'm saying is if you

23   look at paragraph 40, it says since at least

24   February 2017, however, and presumably much earlier,

25   unbeknownst to Hunt, Hunt was developing its own online

1    document solution.  It had no intention of renewing the

2    signing agreement.

3         So that's alleging that as of February 2017

4    there was an intent not to proceed with them.

5         THE COURT:  Okay.

6         MR. PRYWES:  It doesn't allege that in January

7    or December when some of these earlier communications

8    were made that there was an intent at that point in

9    time not to proceed in good faith with Hunt to try to

10   enter a contract.  That's a huge difference because,

11   okay, in February, just a few days after they find

12   out -- just a few days in mid-February, they tell them

13   -- Hunt tells them I do realize we still need to

14   discuss this.

15        This is part of a much larger initiative in

16   setting up our standard processes.  I mean, something

17   is going on there, the brakes have been put on, any

18   discussion of a further contract.  So where is the

19   detrimental reliance on anything that's said in

20   February which is the crucial time period they picked

21   in the complaint?

22        THE COURT:  Wait.  I'm still not getting your

23   argument.  Paragraph 40 says at least from February but

24   probably presumably earlier --

25        MR. PRYWES:  Right.

1      THE COURT:  -- Hunt was developing its own

2  online document solution and had no intention of

3  signing a contract.

4      So the way I read this is that there were these

5  exchanges prior to February which in retrospect made

6  clear that, from the plaintiff's point of view, that

7  Hunt was stringing them along.

8      MR. PRYWES:  That's not what's pled.

9      THE COURT:  Well, no, let me just finish.  I

10  mean, so what paragraph 40 is saying is, look, there's

11  some series of exchanges that happened before February.

12  But as of February saying they clearly had developed

13  the -- they had made the decision to develop their own

14  platform and to not enter the contract, and they may

15  have made that decision even earlier.

16      MR. PRYWES:  Right.

17      THE COURT:  And then it goes on February through

18  April, there's a continuing stringing along.

19      MR. PRYWES:  No.

20      THE COURT:  Well, that's the --

21      MR. PRYWES:  You know --

22      THE COURT:  In April, additionally, around

23  April, Hunt knew that MHL was spending money on further

24  Hunt specific rebuilds.  They didn't inform them.  And

25  then in April -- I forget where it is -- there's the

```
 1    exchange that says I know we need to continue to talk
 2    about this.
 3         So I'm not understanding your point that if they
 4    knew in February that they were not going to continue
 5    the relationship, that somehow that's not sufficient if
 6    there is an obligation to disclose that and not to
 7    misrepresent, not to conceal that information.  Why is
 8    it inadequate if it's February as opposed to December?
 9         MR. PRYWES:  Because in February they told them
10    there is a larger initiative under way.  We're not
11    going to talk to you about a contract anymore.  We have
12    to wait and see how that pans out.
13         THE COURT:  Where is that in the complaint?
14         MR. PRYWES:  That's in -- they quote that e-mail
15    in the complaint.  It's in paragraph 35 of the
16    complaint.
17         THE COURT:  The e-mail says, "I do realize we
18    need to discuss that.  This is part of a much larger
19    initiative in setting up our standard processes.  And
20    I'll be better informed to speak on this in 30 to 60
21    days."
22         I'm not sure what you're saying.  That's not a
23    disclosure that we're setting up our own platform and
24    we're no longer going to be using you.
25         MR. PRYWES:  No, but what was disclosed here
```

1      from day one is that no contract had been entered,

2      right?  I mean, that's the allegation.  The allegation

3      is that we represented we would continue the

4      relationship -- the historic relationship -- okay.  The

5      historic relationship, first of all, is terminable at

6      will so it's sort of meaningless to say that we strung

7      them along because we could have terminated at any

8      time.  So if you're continuing the historic

9      relationship and that's terminable at will, then where

10     is the fraud?

11            But the other point that I haven't had a chance

12     to make yet is that if you look at all those e-mails

13     from December 2016, January 2017, in each case it is

14     clear that any agreement that the parties might enter

15     is subject to a written execute agreement.  In every

16     e-mail, every communication, that's what they were

17     talking about.  These were preliminary negotiations

18     where everybody knew that --

19            THE COURT:  I don't see why that has any bearing

20     on this.  To me this is all about a simple thing which

21     is plaintiff says the defendant knew it was going to

22     set up its own platform and wanted to make a seamless

23     transition from plaintiff's platform to their own

24     platform.

25            MR. PRYWES:  Right.

1        THE COURT:  And they knew that if they told them

2    in the e-mail in February, if Ms. Plesh had said

3    something like we're going to set up our own platform

4    but it's not going to be ready in 60 days so there's

5    really no point in discussing this, plaintiff probably

6    would have just walked away and said, well, forget

7    about it.

8        MR. PRYWES:  What they were talking about was

9    the continuing -- they were talking about a draft

10   contract, okay.  That's what all the discussions were

11   about.  Plaintiff has conceded that Hunt never agreed

12   to any of those draft contracts.

13       THE COURT:  But that's not the point.  The point

14   of those counts is not that the defendant didn't agree

15   to our draft contract.  The point is that the defendant

16   knew that it wasn't going to do the contract, it wasn't

17   going to continue the relationship, it wasn't going to

18   use us anymore.  That's the point.  And they concealed

19   it.

20       MR. PRYWES:  Well, it had no duty to tell them

21   anything other than that any contract we enter will

22   have to be executed.  These were preliminary

23   discussions about a contract.

24       THE COURT:  But the cause of action is for

25   misrepresentation and fraudulent concealment and so

1    forth, right?

2          MR. PRYWES:  Right.  But they knew all along

3    that no contract had been entered.  There was no

4    concealment of that.  There was no nondisclosure of

5    that.  They knew that.  And if you take their version

6    of what the historical relationship was, and this is

7    really important, it was terminable at will so there

8    was no stringing along.  They could have terminated

9    them at any time.

10         Where is the fraud if you tell someone I'm going

11   to continue a relationship that I can terminate at any

12   time?  How is that fraudulent?

13         THE COURT:  It's not the termination.  It's the

14   concealment.  Liability for fraudulent concealment

15   arises from one party to a transaction who, by

16   concealment or other action, intentionally prevents the

17   other from acquiring material information.  And that's

18   what they're alleging here, that there was material

19   information.  The information is we're not going to use

20   you anymore.  They knew it and they didn't tell them.

21         MR. PRYWES:  Well, if there's no -- I don't have

22   to tell my accounting firm I'm not going to use you

23   anymore as long as I don't make a representation that I

24   am going to use you, okay.  And they didn't make any

25   representation --

1    THE COURT:  The complaint says they did.

2    MR. PRYWES:  But that's why this complaint is

3    different than your run-of-the-mill complaint because

4    the only allegations that are alleged with any

5    particularity about communications are those in these

6    e-mails and in one telephone call.  So your Honor has

7    before you what those communications were.  And if you

8    look at them carefully, you will see that they're all

9    talking about a draft contract, they're all talking

10   conditional -- they're all conditioning any commitment

11   based on entry into an executed written agreement.

12   Now --

13   THE COURT:  I need to cut you off.  I need to

14   cut you off.  I have to give Mr. Renner a chance here.

15   MR. PRYWES:  Thank you for your time.

16   MR. RENNER:  Thank you, your Honor.  Big picture

17   observation, right?  This is a motion to dismiss,

18   right?  We're not required -- or plaintiff is not

19   required to conclusively show, you know, that it's

20   going to succeed on its claims as, you know, it seems

21   to be alleged by Hunt here.  You know, I'm not going to

22   reiterate what's in the brief.

23   THE COURT:  Well, you do have -- there's a

24   legitimate question raised here, whether this is a

25   contract or not.  And the complaint seems to be talking

1    out of both sides of its mouth.  I mean, on one hand,

2    as Mr. Prywes says, it's saying this is an oral

3    agreement for a long-term relationship that will go on

4    for many years, et cetera, et cetera, which poses a

5    couple problems, one of which is a statute-of-frauds

6    problem.

7         But out of the other side of the mouth the

8    complaint is saying it was a terminable-at-will

9    contract.  So what is it?

10        MR. RENNER:  Terminable at will.  In paragraph

11   15, we specifically say that there is no set duration

12   for the contract.

13        You had mentioned earlier that it was

14   plaintiff's aspiration or understanding or hope that

15   the contract would be long term, that the parties would

16   continue their relationship long term, which in fact

17   they did for roughly nine years.  So we specifically

18   allege, you know, hopefully clearly, perhaps not, that

19   the contract was terminable at will; there was no

20   specific duration.

21        On the statute-of-frauds argument, this idea of

22   a long-term contract, you know, taking it, you know,

23   into the statute of frauds, you know, I would point the

24   Court to the *Loan Modification* case from the First

25   Circuit which I think is, you know, pretty much on

1    point there, you know, which we discussed in our brief.

2    But basically that was a partnership -- or the

3    allegation was that there was a partnership that was

4    supposed to last for this four-year duration of the

5    federal HAMP program.

6         So the allegations in that case were that the

7    parties' intent was to carry on this partnership for

8    four years.  So naturally the defendant in that case

9    said statute of frauds.  Well, the First Circuit said

10   that was the hope of the parties but, you know, there

11   was nothing that was specific for four years.  It was

12   just an abstract concept or a hope that it would last

13   for four years.  It could have lasted for four days.

14        THE COURT:  I get the argument on the statute of

15   frauds.

16        Come back to the basic issue, though, of why is

17   this a contract between these two parties?

18        MR. RENNER:  The terms of the contract as, you

19   know, in the complaint, plaintiff agreed to provide its

20   services and products, it's these document centers,

21   they would create and maintain for Hunt, these online

22   document centers.  In return Hunt would not give them

23   money, but would give them something else that was

24   valuable to plaintiff which were these daily move-in

25   reports.  So every single day, you know, Hunt would

1       forward to plaintiff these list of customers, you know,

2       they're moving to the properties, these customers that

3       were moving into the properties, which were valuable to

4       plaintiff because plaintiff could then, you know, in

5       turn cross-sell them and earn commissions.

6               So the consideration, you know, may not have

7       been in the form of money, but it was certainly

8       consideration because it was something of value to

9       plaintiff.  The terms, you know, as pled are just that

10      straight forward.

11              In return for plaintiff's provision of these

12      online document centers, Hunt forwarded the daily

13      move-in reports.  And the parties continued to perform

14      under that arrangement for roughly nine years.  You

15      know, that's the contract in this case, the document

16      centers contract as alleged in the complaint.

17              THE COURT:  So they provide this platform.

18      People go on it.  They fill in their rental

19      applications.  They fill out their -- whatever other

20      forms they have to fill out to get the housing.  That's

21      what happens.  And then they are electronically

22      submitted through plaintiff's platform to Hunt?

23              Is that how it goes?

24              MR. RENNER:  Yeah.  I mean, generally speaking,

25      what happens is say some military personnel gets

1   reassigned to a base in, I don't know, Fort Worth,

2   Texas, right, so they could go on to Hunt's website,

3   find the base that's in Forth Worth, Texas.  And then

4   there's a link or something -- I don't know what it

5   says exactly but, you know, apply for housing.  And

6   then that link would direct this military person to

7   plaintiff's website where they would fill in all kinds

8   of information about -- you know, they could fill in

9   about pet information, information about their

10  vehicles, you know, all kinds of stuff that, you know,

11  is going to be relevant to them living on the base.

12      And then that information would in turn be

13  forwarded back, you know, provided back, you know, it

14  would be put into a manageable -- a database or

15  something for Hunt so that Hunt's property managers

16  could utilize it.  So in return for plaintiff doing

17  that for Hunt, Hunt in turn, you know, gave them this

18  list of customers.  And plaintiff earned money by

19  cross-selling and earning commissions, you know, from

20  cable companies, all kinds of other vendors that people

21  would -- you know, phone companies, you know.

22      So that's the contract.  That's what the parties

23  performed according to those terms for roughly nine

24  years.  And yet there was this discussion in 2016 and

25  into '17 about, you know, in writing, memorializing

1    their relationship.  But as your Honor said, you know,

2    we're not claiming that defendants are in any way bound

3    by these draft contracts, you know, that never came to

4    fruition.

5         The contract that's the basis of our complaint

6    is the original document centers contract that the

7    parties performed according to for all those years.

8    And this -- turning to the reasonable notice issue, you

9    know, I cited, I don't know, how many, you know, well

10   over a dozen cases, treatises and the analogous UCC

11   provisions that all say the same thing.  They all say

12   that in contracts calling for successive performance,

13   you know, continuing performance, which is what we have

14   here, that a contract is terminable at will upon

15   reasonable notice.

16        Now, you know, what is reasonable notice varies

17   case to case.  You know, that's what a jury is for, you

18   know.  Is it 30 days?  60 days?  A year?  You know,

19   what's reasonable?  The basic requirement of reasonable

20   notice.  I mean, that's universally followed, you know.

21   Maybe it hasn't arisen in Rhode Island but, as I said

22   in my brief, you know, I don't think they cited a

23   single case that says reasonable notice isn't required.

24        There were some cases from 40, 50 years ago that

25   have since been overturned and are no longer good law

1    but, I mean, you know, the rule is reasonable notice is

2    required to terminate.  And that's all we're claiming

3    here, you know.

4         And personal services, you know, is this

5    analogous to a personal services contract?  Well,

6    there's a good reason, public policy reason, why

7    personal services or employment contracts don't have

8    the reasonable notice requirements.  Because, you know,

9    the law doesn't want, you know, servitude, doesn't want

10   an employee who doesn't want to keep working for the

11   employer, doesn't want to have them, you know, keep

12   working when they don't want to be here.  Same on the

13   flip side; they don't want an employer to be forced to

14   continue to employ someone, you know.

15        But this is not a personal services contract.  I

16   mean, we have two separate businesses engaged in

17   commerce, you know.  For a whole host of reasons,

18   plaintiff was not an employee of Hunt.  So, you know,

19   the personal services rule is just not applicable here.

20        THE COURT:  Well, I mean, there are all sorts of

21   relationships that are not employment based that don't

22   require notice for termination.  I mean, counsel used

23   the dry cleaning example or, you know, the mechanic of

24   my car or whatever.

25        MR. RENNER:  Yeah.  Well, I guess I would point

1    out that, you know, those aren't calling for successive

2    performance, you know, like we have here.  Those are

3    kind of -- each is a discrete, you know, act in and of

4    itself.  You know, you go to the dry cleaner one time

5    and you go another time, you know, so it's not a kind

6    of continuing relationship.

7         THE COURT:  What's the difference between this

8    and, say, I don't know, Craigslist or some other online

9    platform that people use to engage in commerce?

10        MR. RENNER:  Well, again, I think the difference

11   is that those are one-off contracts.  They're not

12   contracts calling for successive performance, you know,

13   continuing performance like we have here where you've

14   got plaintiff investing, you know, money, time,

15   resources in, you know, building up its business based

16   on the continuing relationship.

17        The purpose of the notice requirement is when

18   there's -- you've got two businesses and they're -- you

19   know, they've come to rely on that relationship.  The

20   purpose is that if one party wants to terminate which,

21   you know, again, Hunt was free to terminate plaintiff

22   at will.  There's no dispute there.  The only dispute

23   is what kind of notice were they required to give.

24        THE COURT:  Well, let's say -- I mean, maybe an

25   analogy is advertising.  Say I hire an advertising firm

1    and I say, look, I want you to develop a website for me

2    that effectively represents the company and develops

3    some social media approaches, you know, develop a

4    Twitter account, develop a Facebook account, you know,

5    tweet things out for us and so forth.  And the company

6    does that and it's an ongoing relationship.  They've

7    got some back and forth happening.  You know, we've got

8    this new product.  Would you send something out on

9    that.  Would you generate some interest.  And then one

10   day they decide to use a different company for that.

11          Do you think they have to give reasonable

12   notice?

13          MR. RENNER:  Yeah.  To the extent that the

14   advertising agency isn't acting as an agent on behalf

15   of.  You know, this personal services applies to

16   employment contracts and agency contracts so to the

17   extent that the advertising company isn't acting as an

18   agent of the business and thus a personal services

19   contract then, yes, I would submit that the law says

20   that they have to give reasonable notice.

21          Now, again, what is reasonable notice?  That's

22   for a jury.  You know, it could be a week, it could be

23   30 days.  But when you have continuing successive

24   performances, you know, the law says that if you want

25   to terminate, which is your right, you need in good

1    faith to give reasonable notice.

2         THE COURT:  Let's assume that reasonable notice

3    is a month.  So what are your damages?

4         MR. RENNER:  The lost profit during that

5    reasonable notice period.

6         THE COURT:  So a month's lost profit?  What

7    could that be?  That can't be that much.

8         MR. RENNER:  You know, it varies case to case.

9    In that situation it might not be that much.  But in

10   this case, it could be, you know, six months, nine

11   months, you know.  There's case law, you know, there's

12   plenty of cases, you know, where courts have found or

13   juries have found, you know, reasonable notice for many

14   months, if not years.

15        THE COURT:  How could it be that in a

16   relationship like this you would need to give a year's

17   notice?  I mean, I can't imagine any jury would find

18   that.

19        MR. RENNER:  Well, the courts -- what it's based

20   on, you know, loosely speaking, is the amount of time

21   that it would take to replace or seek a substitute

22   arrangement.  You know, in this case, I would submit

23   that the reasonable notice period should be measured by

24   the amount of time that it would take plaintiff to find

25   a replacement or a substitute arrangement for Hunt.

1        THE COURT:  Why should it be measured that way?

2        MR. RENNER:  That's just what the court said.

3        THE COURT:  Your client is providing a service.

4   Use my analogy of a company that's providing

5   advertising or social media.  I mean, that doesn't

6   sound like that's the way the law should work that, you

7   know, you have to give us enough notice to allow us

8   time to replace you as a customer and if it takes us a

9   year?

10       MR. RENNER:  That's just the way the restatement

11  works -- excuse me, the UCC works.  It says that, you

12  know, the measure of the notice period is the amount of

13  time it would take to seek a substitute arrangement,

14  you know.  Other factors might play a role, you know,

15  the length of the relationship between the parties, the

16  importance of one party to the other, you know.

17       So it's all measured, it's on a case-by-case

18  basis.  So what might be reasonable in one case, you

19  know, it could be more or less in another case.  That's

20  just the way it is.  And again, that's a question

21  for -- what is reasonable notice is for the jury to

22  decide.  That's a question of fact.

23       THE COURT:  Okay.  We might be getting ahead of

24  ourselves on that one.

25       MR. RENNER:  So I could move on briefly to the

1    fraud counts.  You know, your Honor described the

2    theory of our fraud claims pretty well.  It's this

3    string-along fraud that Hunt knew for many months that,

4    you know, it was intending and it was going to

5    discontinue the relationship and all the while it made

6    representations and omissions which is, you know, just

7    as important here, the failure to disclose, that it was

8    going to terminate the relationship in order to keep

9    the plaintiff working until it could, you know, build

10   its own solution.  That's the nature of the claim.

11        This whole idea about, you know, what the

12   e-mails say or what plaintiff should or shouldn't have

13   known or should have gleaned or what should have been

14   obvious, you know, that's all well and good and Hunt is

15   free to advance, you know, that theory of its case

16   going forward.  But on a motion to dismiss, you know,

17   it's just not proper for it to basically put its own

18   spins and introduce its own facts, you know.

19        Nowhere do any of those e-mails say that, you

20   know, the relationship continuing is subject to this or

21   that or conditioned on this or that or that much less

22   that we may or intended to terminate, you know.  That's

23   just not anywhere in those e-mails.  It's not anywhere

24   in the complaint.  In fact, it's the opposite.  The

25   complaint specifically says that Hunt never even

1    suggested that it didn't intend to continue the

2    relationship or that it didn't intend to sign a

3    contract, you know.

4         THE COURT:  Okay.  All right.  I think I've

5    heard enough, Mr. Renner.  Thank you.

6         MR. RENNER:  Thank you.

7         THE COURT:  All right.  I'm going to rule from

8    the bench.  I think that the complaint has stated

9    sufficiently causes of action that are alleged in order

10   to survive a motion to dismiss.  I'm going to deny the

11   motion to dismiss in full.  I'll put my reasons in a

12   very short written order that will follow in a few

13   weeks, but I don't think there's any need for a long

14   elaboration of the reasons for denying, although I will

15   give you enough so that you can understand my

16   rationale.

17        What do you need for discovery in this case, do

18   you think?

19        MR. RENNER:  E-mails from Hunt, you know,

20   internal --

21        THE COURT:  I mean, how much time?

22        MR. RENNER:  Oh, time?  I mean, I would think

23   for fact discovery six months should suffice and maybe

24   two months for expert discovery.

25        THE COURT:  What experts?

1          MR. RENNER:  Damages expert and possibly an

2     industry standard expert who could testify as to what

3     the reasonable notice, you know, would have been in the

4     industry.

5          THE COURT:  All right.  Do you agree with that?

6          MR. PRYWES:  I'd push it out maybe.  I think

7     eight months would be a little more reasonable.

8          THE COURT:  Well, I think if we include the

9     experts, you'll be up to that amount of time.  So

10    here's what I'm going to do.  I'll give you six months

11    for fact discovery and then plaintiff expert

12    disclosures 30 days following that.  Defendants' expert

13    disclosures within 30 days after that.  And then expert

14    depositions will follow 30 days.  And then either

15    pretrial memos or motions for summary judgment to be

16    filed within 30 days after the discovery closure

17    deadline.

18         Then there is a dispositive motion.  The

19    pretrial memos will be due 30 days after a decision on

20    the dispositive motion.  So all of this will be reduced

21    to a text order or a pretrial order with the specific

22    dates in there.

23         Now, having said all that, we'll get the

24    discovery rolling in this case.  I think you all should

25    have a settlement conference I think on the early side

1      rather than waiting too long because, Mr. Renner,

2      unless you can come up with something that is pretty

3      strong here in terms of what you think the industry

4      practice is about reasonable notice and that it's some

5      lengthy period of time, the way I look at this case,

6      sort of at the end of the day, the damages are defined

7      by whatever the loss profits are for, assuming you

8      could get by summary judgment on all these issues,

9      which is an assumption, a significant assumption.  But

10     your damages are defined by that period of time between

11     when the notice was given of the termination and when

12     it should have been given under a reasonable notice

13     theory, right?

14           MR. RENNER:  Well, for the breach-of-contract

15     claim, yes.  But I look at the fraud claim separately,

16     you know.  That's when did they have a duty to

17     disclose?

18           THE COURT:  Why is it different?

19           MR. RENNER:  Well, because in addition to lost

20     profits, the fraud claim -- and again, this is probably

21     going to be the subject of an expert report, but in

22     addition to the lost profits for plaintiff, plaintiff

23     provided services, you know.  So another measure of its

24     damages would include the value of the services

25     provided during the time that, you know, it was relying

1     on Hunt's representation.

2          THE COURT:  What does that mean, the value of

3     the services provided?  I don't understand that.

4          MR. RENNER:  Well, it could mean, you know, on a

5     free fair-market value of the services, you know, how

6     much it would have charged.  Again, it didn't charge

7     anything to Hunt to provide these services.  So one

8     measure might be the fair-market value.

9          THE COURT:  But that was your contract; you just

10    described it.  The contract was that we give you a

11    platform and you give us these reports.  That's the

12    contract.

13         MR. RENNER:  That was the contract.

14         THE COURT:  So there is no claim for value

15    beyond that if that's what you think your contract is.

16    Your client makes money through these various

17    commissions that occur because of that.  You know, if

18    they should have given you 30 days or 60 days or 90

19    days, whatever was lost during that period, if you can

20    find a way to prove that, and there might be historical

21    reference that proves whatever that is, you know,

22    that's the measure of your client's damages.

23         But, you know, the idea that there's an

24    obligation to give us five years' notice or ten years'

25    notice, I just don't see that.  So what I'm getting at

1      is before you all go out and just, you know, run up a

2      lot of legal fees in this case, I think you ought to

3      have a settlement conference to see if this thing could

4      be worked out.  So I'm going to encourage you to do

5      that on the early side.  I do think probably some

6      initial disclosures and some preliminary discovery

7      would make sense so that you can get a, you know, real

8      precise understanding of what it is that's being

9      claimed and what the claims are on the defense side.

10            So I'm going to ask Judge Sullivan to reach out

11     to you in about two to three months, depending on her

12     schedule, to see if she can get you in for a settlement

13     conference, all right.

14            Okay.  All right.  Thank you very much.  We'll

15     be in recess.

16            COURTROOM DEPUTY:  All rise.

17            (Time noted:  11:17 a.m.)

18

19

20

21

22

23

24

25

1

2                          **CERTIFICATION**

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5

6

7    Official Court Reporter          July 25, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

